Angelo L. Rosa (Idaho State Bar No. 7546)
ANGELO L. ROSA, ESQ.
2211 East Camelback Road, No. 302
Phoenix, Arizona 85016
Telephone:    +1 (801) 440-4400
Fax:              +1 (208) 515-2203
E-mail:          arosa@rosacommerce.com

Attorneys for Plaintiff
SOUTHERN IDAHO AMBULATORY SURGERY CENTER, LLC

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SOUTHERN IDAHO AMBULATORY SURGERY CENTER, LLC, an Idaho limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TWIN FALLS NSC, LLC, a Tennessee limited liability company; and AMSURG HOLDINGS, INC., a Delaware corporation,<br><br>Defendants. | Case No.<br><br><br><br><br>**COMPLAINT FOR DAMAGES** |

**COMPLAINT FOR DAMAGES – Page 1**

COMES NOW Plaintiff, SOUTHERN IDAHO AMBULATORY SURGERY CENTER, LLC ("Plaintiff" and/or "Sawtooth") by and through its counsel of record, ANGELO L. ROSA, ESQ., and respectfully files its Complaint for Damages ("Complaint") and alleges as follows:

## I.

## INTRODUCTION

1.     This is a civil action based on diversity of citizenship jurisdiction to recover damages from Defendant, AMSURG HOLDINGS, INC. a subsidiary of ENVISION HEALTHCARE CORPORATION ("AmSurg").   The damages alleged herein arise from the malfeasance of AmSurg's alter-ego and co-Defendant, Twin Falls NSC, LLC ("Twin Falls NSC") in the form of gross mismanagement committed by Twin Falls NSC (a) during its ownership of a majority membership interest in, and (b) in its capacity as Managing Member of Plaintiff, Southern Idaho Ambulatory Surgery Center, LLC, which owns and operates an outpatient ambulatory surgery center in Twin Falls, Idaho.

2.     Sawtooth and Twin Falls NSC are parties to an arbitration proceeding initiated by Sawtooth and currently pending before the American Arbitration Association (the "Arbitration") in accordance with the dispute resolution procedures dictated by the Second Amended and Restated Limited Liability Company Agreement of Southern Idaho Ambulatory Surgery Center, LLC (the "Sawtooth Operating Agreement").   No disposition of the Arbitration has yet occurred. This action has been filed to preserve all rights and remedies associated with the facts and causes of action referenced below.   Sawtooth therefore anticipates applying for a stay of this action pending the outcome the aforementioned Arbitration.

## II.

## THE PARTIES, JURISDICTION AND VENUE

**COMPLAINT FOR DAMAGES** – Page 2

3.      Plaintiff, Southern Idaho Ambulatory Surgery Center, LLC, is, and at all times relevant hereto, was a limited liability company in good standing before the Idaho Secretary of State, licensed to transact business in the State of Idaho, and having its principal place of business in the County of Twin Falls, State of Idaho.

4.      Defendant, AmSurg Holdings, Inc. is a Delaware corporation in good standing before the Delaware Secretary of State.  Prior to 15 June 2016, AmSurg was a wholly owned subsidiary of AmSurg Corp., a Tennessee corporation.  On or about 15 June 2016, AmSurg Corp., Envision Healthcare Corporation ("Envision"), and New Amethyst Corp.--a newly formed Delaware corporation and a direct, wholly-owned subsidiary of AmSurg Corp. ("New Amethyst")--entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Envision and AmSurg would combine in an all-stock merger.  Upon information and belief based upon representations made in Envision's filings with the Securities and Exchange Commission regarding the terms and subject to the conditions set forth in the Merger Agreement, AmSurg merged with and into New Amethyst, with New Amethyst continuing as the surviving corporation. Then, immediately thereafter, Envision merged with and into New Amethyst, with New Amethyst continuing as the surviving corporation.  Upon the closing of the aforementioned mergers, the name of the combined company was changed to "Envision Healthcare Corporation", which is the current parent company of AmSurg Holdings, Inc.

5.      The United States District Court for the District of Idaho has original jurisdiction over this action under 28 U.S.C. § 1332(a)(1).  Venue is proper in the District of Idaho because the injury took place within the boundaries of this judicial district: the business transactions upon which this action is based were conducted in the State of Idaho and under the auspices of an agreement (the Sawtooth Operating Agreement) governed by Idaho law. All parties therefore

COMPLAINT FOR DAMAGES – Page 3

purposely availed themselves of Idaho law and have sufficient minimum contacts with the State of Idaho.

6.      Original diversity jurisdiction exists because (a) the sum or value of the amount in controversy exceeds the jurisdictional threshold of $75,000.00, inclusive of interest and costs, and (b) the action is between citizens of different states, namely (i) an Idaho limited liability company as Plaintiff ("Sawtooth"); (ii) a Tennessee limited liability company as Defendant ("Twin Falls"); and (iii) a Delaware corporation as co-Defendant ("AmSurg").

## III.

## BACKGROUND FACTS

### Sawtooth's Modest Beginnings and Self-Managed Growth

7.      Sawtooth Surgery Center was founded in 1998 by a small group of dedicated surgeons in the Magic Valley region of Idaho. During the first eight (8) years of operation, the Center typified the best spirit of entrepreneurial growth and promotion of patient choice in Idaho's healthcare sector. From 1999 through 2006, patient cases increased, as did patient receipts, and consequently distributions to Sawtooth's Members. Expansion was planned and executed. Recruitment was focused and carried out. As a result, <u>Sawtooth performed above the national average in the number of cases undertaken, number of operating rooms, and in accounts receivable</u>.

8.      As Sawtooth grew, the prospect of large-scale funding and national resources motivated a partnership between Sawtooth and a company called National Surgical Corporation ("NSC"). NSC acquired a fifty-one percent (51%) ownership interest in Sawtooth in 2007, assumed the position of Managing Member of Sawtooth, and held its interest through a special purpose entity known as Twin Falls NSC, LLC.

**COMPLAINT FOR DAMAGES** – Page 4

9.      Sawtooth prospered further under NSC's ownership with (a) NSC as the Managing Member providing focused support and resources as its Managing Member and (b) Sawtooth's non-Managing Members (located in Twin Falls) providing input and planning to complement the resources provided by NSC.  With NSC motivated to see its investment yielding the sought-after return and Sawtooth's non-Managing Members deploying the resources that the partnership was intended to provide, income increased and debt was managed.    Notwithstanding certain problems with administrative matters, NSC's management was largely a positive and growth-oriented experience.  Local expertise by the non-Managing Members was integral to the steering and growth of Sawtooth's activities.  Large-scale corporate resources were deployed with attention paid by NSC to the individual needs posed by Sawtooth's circumstances and the marketplace in which Sawtooth provided healthcare services.  Ample time was given by NSC's management to the attention required by Sawtooth.  In broad terms, NSC ensured that its investment was well-managed and prudently administered.  This generally positive partnership continued until AmSurg Corporation acquired NSC in 2011.  This marked the turning point into a period of incompetent and disinterested management of Sawtooth's affairs.

<u>AmSurg's Acquisition of Controlling Interest in Sawtooth</u>

10.      In late 2011, NSC sold the majority of its portfolio of ambulatory surgery centers to AmSurg Corporation.  This resulted in NSC's majority membership interest in Sawtooth (held through Twin Falls NSC) being transferred to AmSurg.  On or about 20 October 2011, this change in ownership was documented with the Idaho Secretary of State.  Over time, this controlling membership interest of 51% was adjusted to 54%.  As Managing Member of Sawtooth, AmSurg (through Twin Falls NSC) was conferred broad managerial powers and control.  In exchange, AmSurg (through Twin Falls NSC) would receive a monthly 'Management Fee' equal to seven-

percent (7%) of Sawtooth's net receipts. This fee was adjusted down to six percent (6%) in January 2012 under the terms of the Sawtooth Operating Agreements due to financial performance not meeting the threshold justifying the (previously) higher percentage. Nevertheless, the lower management fee under the new calculus still yielded AmSurg approximately $44,000 during the first month following the adjustment. Indeed, the one constant factor during AmSurg's ownership of Twin Falls NSC and control of Sawtooth was the payment of its management fee. However, as explained below, AmSurg did little to earn that compensation.

11.     Contrary to its responsibilities and (fiduciary) obligations under the Sawtooth Operating Agreement, Twin Falls NSC (under AmSurg ownership) became minimally involved in the development and preservation of Sawtooth's business. **In stark contrast to NSC, the acquisition of Sawtooth by AmSurg was not conducted with the same metrics of direct investment and correspondingly motivated AmSurg little to ensure its bulk acquisition of Sawtooth bore fruit.**

### AmSurg's Gross Mismanagement of Sawtooth

12.     Over the following six years, from 2011 through 2017, the Center's business and operational prospects deteriorated under Twin Falls NSC's stewardship. The theme of the relationship with Sawtooth was defined by its non-Managing Members with common adjectives such as 'disinterested', 'disengaged', and by concepts such as 'failing to follow through', and 'not caring about the Center'. The majority of these concepts fall under the heading of gross mismanagement and have been documented in relation to industry standards within the healthcare sector by experienced professionals retained to examine Twin Falls NSC's behavior with respect to Sawtooth.

13.     Twin Falls NSC's 'management' of Sawtooth consisted almost exclusively of such things as dispatching pre-formatted/generic materials generated on a corporate level under the name of "AmSurg" and distributed *en masse*, addressing banalities such as cleaning and housekeeping, sharing copies of the Medicare Handbook authored by the Accreditation Association for Ambulatory Health Care, and incidental benefits arising from Sawtooth being added to AmSurg's bulk-provisioning/procurement discount schedules. **With very few exceptions, all of these managerial actions were a superimposing of generic corporate resources to a surgery center that was uniquely situated and uniquely affected by market conditions; if a Managing Member was to properly manage Sawtooth, a 'bespoke' approach was necessary instead of the 'one size fits all' philosophy that appeared to govern the resources dictated to Sawtooth by AmSurg.** To its credit, Twin Falls NSC *did* provide basic accountancy and bookkeeping services (aided by a powerful software platform) and annual income tax preparation. However, six-percent (6%) of Sawtooth's net receipts were a steep price to pay for such fungible services.

14.     Under AmSurg's control, Twin Falls NSC participated in significantly fewer management meetings and site visits than its successor (NSC) did. Twin Falls NSC participated in annual meetings, made site visits on a roughly quarterly basis (primarily through its liaison, Todd Shepherd) but very little effective progress made as a result.

15.     With the transition in management and control to AmSurg, a significant increase on patient charges occurred. Patients began to complain about the charge increases, and this was discussed at one of the annual meetings of Sawtooth's Board of Directors. Eventually, AmSurg did reduce the charge. However, AmSurg looked to other means of squeezing profitability from Sawtooth. *See infra.*

**COMPLAINT FOR DAMAGES** – Page 7

16.     In 2012 and 2013, AmSurg conducted a Physician Survey for Sawtooth. The overall satisfaction rate of physicians operating at Sawtooth dropped from seventy percent (70%) in 2012 to twenty-five percent (25%) in 2013. Satisfaction rates dropped dramatically for numerous indicators, including scheduling needs, starting on time, patient wait times, growth opportunities, property management and building maintenance, and strategic planning support.

17.     All patient-care and day-to-day planning was incumbent upon the local employees and non-Managing Members of Sawtooth to formulate. While Twin Falls NSC was the final decision-maker, any changes that could be effected for the betterment of Sawtooth's operations took place exclusively at the local level since Twin Falls NSC could not be relied upon to competently or timely address such needs.

18.     Twin Falls NSC made pitifully few attempts to address the strategic planning needs of Sawtooth. **On the rare occasion such planning did occur, those actions were nominal and any action plans formulated (by AmSurg) to protect or advance Sawtooth's business interests and operational profile were not fulfilled.** One such examples is an alleged 'Strategic Planning Session' held by AmSurg in 2015: the meeting yielded a colorful presentation pamphlet, but the contents of said pamphlet bore little relation to the needs of the Center, consisted of disjointed statistics, and (more critically) no action was taken to implement any of the purported findings in any manner whatsoever. Form prevailed over substance, and substance was fungible.

19.     Similarly, relevant to AmSurg's disengagement was the constant disclosures and pleas for attention made by Sawtooth's non-Managing Members regarding business issues and competition posed to its operation. These issues were raised to the personnel delegated by AmSurg to carry out Twin Falls NSC's duties as Managing Member of Sawtooth, and were communicated on a regular basis, informally as well as 'on the record' during quarterly site visits and Annual

meetings.  Critical among the problems articulated by Sawtooth's non-Managing Members and repeatedly communicated to Twin Falls NSC were (a) dissatisfaction by Sawtooth's ophthalmology practice group with the sufficiency of Twin Falls NSC's management; and (b) acts of interference with Sawtooth's physicians and revenue-generating activities by St. Luke's Medical Group, Ltd. and its affiliates (collectively, "St. Luke's").  *See infra.*

<u>AmSurg's Intentional Facilitation of Ophthalmology Practice Group Departure</u>

20.     Starting in 2013, a number of surgeons specializing in ophthalmology began considering departing from the Center, and ultimately did so.  One such ophthalmologist had acquired his membership interest in Sawtooth in 1999.  Two other ophthalmologists purchased membership interests in 2009 and 2008 respectively.  Additional ophthalmologists began working at Sawtooth during the period of transition from NSC control to AmSurg control.  These physicians constituted the majority of Sawtooth's ophthalmology practice group (referred to herein as the "Ophthalmology Group").

21.     On 14 February 2013, Sawtooth's Board of Directors met with the Ophthalmology Group to discuss their concerns. The primary grievances were (a) AmSurg's erosion of value in Sawtooth due to high management fees, (b) equity equalization tied to revenue generation, and (c) long term planning to transition ownership from retiring Members.  The Ophthalmology Group postulated to Sawtooth's Board of Directors that they [the Ophthalmology Group] would be better off leaving Sawtooth and intended to do so unless positive changes were made.  Twin Falls NSC (through AmSurg) was informed that such changes were necessary for the Ophthalmology Group to retain their surgical activity at Sawtooth.  The majority of Sawtooth's non-Managing Members were sympathetic to these concerns and understood that if some compromise was not reached,

Sawtooth would lose several million Dollars of annual revenue as a result of the Ophthalmology Group's departure.

22.      Throughout the remainder of 2013, a dialogue ensued between the Ophthalmology Group and AmSurg and constituted direct communication without significant participation of Sawtooth's non-Managing Members.   The primary participants for AmSurg in this dialogue were Steve Blom, Regional Vice President of AmSurg, and Kari Lindsay, another high ranking corporate officer at AmSurg.

23.      In early September 2013, one of the physicians speaking for the Ophthalmology Group sent a message to Steve Blom, Regional Vice President of AmSurg, requesting a meeting with Mr. Blom and other AmSurg representatives who had the power to make "final decisions" regarding the Ophthalmology Group's future with Sawtooth.  Over the course of these (and related) communications, Mr. Blom indicated that AmSurg would stand firm on the noncompetition clause governing the professional activities of the Ophthalmology Group.

24.      The Ophthalmology Group continued discussions with AmSurg through May 2014. Initially, Kari Lindsay represented that the requests made by the Ophthalmology Group were realistic. However, this position was reversed when the Ophthalmology Group was told that AmSurg's management fee would be modified only if the lease amount paid by Sawtooth to its landlord was reduced downward.   The lease payments related to a different entity entirely (known as Southern Idaho Medical Park, or "SIMP"), which had numerous owners, some of whom were Members of Sawtooth and some who were not.  While the non-Managing Members of Sawtooth whose interests overlapped with SIMP were supportive of some compromise for the sake of retaining the significant revenue-generating activity of the Ophthalmology Group, the reality of the situation--that the issues surrounding AmSurg's management fee were mutually exclusive of

the issues relevant to Sawtooth's landlord-tenant relationship—made compromise on this point difficult to attain. Ultimately, AmSurg relented from its intent on protecting Sawtooth. AmSurg's production in the Arbitration indicated that AmSurg would eliminate a "medical director fee", which benefitted the physicians participating in ground-level manager. However, AmSurg remained intent on retaining its own management fee. This token gesture of self-interest was not persuasive for the Ophthalmology Group. **When AmSurg could not concede its interests by forcing others to reduce their (unrelated) interests to preserve AmSurg's bottom line, AmSurg withdrew from all discussions with the Ophthalmology Group.**

25.     Despite the knowledge of Twin Falls NSC (through AmSurg) and its purported intent to stand firm on the noncompetition obligations owed by those of the Ophthalmology Group who were also Members of Sawtooth, the Ophthalmology Group was allowed to surrender its membership at $1.00 per unit, in contravention of the provisions of the Sawtooth Operating Agreement and at a price that grossly devalued the equity in Sawtooth (evidenced by transactions indicating a unit price of approximately $4,400). No action was taken by Twin Falls NSC (through AmSurg) to do anything about this transfer and in one of its token "Improvement Plans" issued for 2014, Twin Falls NSC actively references the contemplated departure of the Ophthalmology Group from Sawtooth.

26.     Over the following two years, the Ophthalmology Group continued to perform procedures at Sawtooth while reducing its caseload in 2017 to the point in time where it had abided its noncompetition obligations. **All the while Twin Falls NSC stood by and did nothing, instead preferring the short-term benefit of reaping the Ophthalmology Group's income during the period they were bound by the non-competition obligation and knowing full well the intent to proceed with the construction of a competing surgery center at the end of that**

period. By mid-2017 the Ophthalmology Group cut all ties with Sawtooth and now operates the surgery center they had been planning to construct. **By looking to the short-term benefit, AmSurg forfeited rights against physicians whose membership obligations would have yielded approximately $15,000,000 in projected gross earnings.**

<u>Interference by St. Luke's Medical Group</u>

27.     The Twin Falls medical community is dominated by one entity: St. Luke's. It is well-established that St. Luke's has crushed out competition and independent medical practices throughout Idaho. In the capitol city of Boise and its outlying areas (Ada and Canyon Counties), St. Luke's was adjudicated as liable in a federal anti-trust action. However, regardless of the technical specificities of anti-trust liability, the bare-faced interference and coercion of physicians in the Twin Falls area was a fact well-known to AmSurg prior to its acquisition of Twin Falls NSC and, over the course of the following years, Twin Falls NSC did nothing to prevent or remedy that interference. All attempts to engage with St. Luke's were rebuffed and it was openly acknowledged within AmSurg that St. Luke's position in the Magic Valley was "all or nothing."

28.     Those non-Managing Members of Sawtooth who were working or the members of Sawtooth about the issue. It was known policy by Sawtooth's non-Managing Members that St. Luke's "stated purpose" was "to put [Sawtooth] out of business".

29.     During 2016, St. Luke's completed construction of a new surgical center facility in Twin Falls. This provided St. Luke's with leverage to coerce Sawtooth's non-Managing Members and non-Member physicians--whose concern for patient choice and cost-of-care motivated them to use Sawtooth instead of St. Luke's—into creating a system of consequences for those physicians who performed procedures at Sawtooth: negative peer reviews, allegations of malfeasance, and

attempts to bind physicians exclusively to St. Luke's (despite their status as 'independent contractors') abounded.

30.     The aforementioned tactics of pressuring physicians was made abundantly clear to Twin Falls NSC as demonstrated by Sawtooth's agendas, minutes, intercompany correspondence, and discussions held in person.  Twin Falls NSC demonstrated complete indifference with respect to St. Luke's tactics.  All of Sawtooth's non-Managing Member's demands for Twin Falls NSC to take action to address St. Luke's interference were ignored.

31.     In addition to the acts of interference with Sawtooth's prospective economic advantage, **St. Luke's coerced one of Sawtooth's non-Managing Members to withdraw his surgical portfolio from Sawtooth and move it exclusively to St. Luke's, yet that physician remained a Member of Sawtooth for over one year and Twin Falls NSC took no action to address this blatant breach of the Sawtooth Operating Agreement, enforcement of the noncompetition agreement binding that physician Member, or pursue St. Luke's for its interference with the internal business relationships of Sawtooth.  In short, Twin Falls NSC did nothing.**

AmSurg's Unilateral Attempt to Decommission Sawtooth and Last-Minute Withdrawal from Membership

32.     Twin Falls NSC was aware of the grim financial prospects of Sawtooth (albeit avoidable with proper protection of Sawtooth's legal rights) that were the product of failures to develop Sawtooth's business prospects, expand its reach and protect its interests.   **The repeated failures by Twin Falls NSC to address and challenge erosion of Sawtooth's business (items within its purview as Managing Member and issues within its ability to control) came to a head in late 2016/early 2017.**

COMPLAINT FOR DAMAGES – Page 13

33.     Between late 2016 and mid-2017, Sawtooth continued to lose physicians as a result of the foregoing issues.  It is not surprising that Sawtooth discovered Twin Falls NSC was discussing an exit strategy internally starting at that time; **the decision by Twin Falls NSC to disentangle itself from Sawtooth as it approached its lowest point is coincided with the departure of the Ophthalmology Group and St. Luke's construction of its surgery center with the correlating pressure applied to Sawtooth's physicians to move their cases from the center.**

34.     In August 2017, Twin Falls NSC failed to renew Sawtooth's option to lease the property in which Sawtooth operated.  Consistent with its disengaged and inept character of 'management', AmSurg failed to engage in any consultation or discussion with the non-Managing Members of the Center about this pivotal business decision.  Accordingly, the option to renew passed without notice being given.  No action was taken to engage the non-Managing Members about the issue of continuing business and steps to be taken to preserve existing business and address injuries sustained by the acts of St. Luke's.

35.     During the fourth quarter of 2017, the non-managing Members of Sawtooth attempted to engage AmSurg in a dialogue about the future of the Center.  AmSurg failed to materially respond to these legitimate concerns about the future of the business and, consequently, no coherent plan or decisions were proposed by AmSurg.

36.     In early December 2017, Twin Falls NSC (through AmSurg) unilaterally communicated its intent to wind down the Center: action it was neither authorized the take under the Sawtooth Operating Agreement nor which reflected the wishes of other Members of Sawtooth. **It is consistent with Twin Falls NSC's continuous pattern of neglect and disdain for Sawtooth's prospects <u>to wait until one month before the termination of Sawtooth's lease to</u>**

**COMPLAINT FOR DAMAGES** – Page 14

<u>begin winding down an ambulatory surgery center</u>, to say nothing of the operational realities of patient care or the market considerations that Sawtooth was the sole independent surgical center in a region where patient choice continued to rapidly dwindle in the shadow of St. Luke's.

37.     On December 13, 2017, Dr. H. Peter Doble, II (Sawtooth's Medical Director) informed fellow Member Dr. William May that 'AmSurg' was attempting to terminate operation of the Center.   Dr. Doble also informed Dr. May that 'AmSurg' had allowed its option to renew the lease.  This coincided with a random and unannounced 'capital call' by Todd Shepherd (again, AmSurg's liaison with Sawtooth) on or around 15 December 2017 citing the dire circumstances surrounding Sawtooth's affairs and the need for cash to sustain the business through the remaining two weeks of 2017.    No mention was made of forfeiting AmSurg's management fee or any other concessions.  It therefore became incumbent upon the non-Managing Members to take action in light of AmSurg's mismanagement of the situation to the point where an attempt to shut down the business they had grown, placed into the hands of others and then brought to the brink of ruin through intentional misconduct.

38.     During the last few weeks of December 2017, intense discussions took place between counsel for Sawtooth's non-Managing Members and AmSurg regarding the future prospects of the Center.  Twin Falls NSC's counsel refused to understand or acknowledge that it had no authority to unilaterally decommission Sawtooth and (astonishingly) failed to demonstrate comprehension that an ambulatory surgery center could be decommissioned in three weeks over the December holiday season.  Throughout these discussions, and particularly with regard to the matter of how Sawtooth would be administered, Twin Falls NSC and its counsel displayed a

complete ignorance of the facts and agreements governing Sawtooth's management and operations.

39.     Ultimately, Twin Falls NSC elected to 'wash its hands' of Sawtooth and, over the Christmas holiday, agreed to withdraw from ownership in the Center effective 26 December 2017 with all parties retaining their respective rights and remedies.

40.     Notwithstanding the period of complete disengagement during the fourth quarter of 2017 and the exclusive focus during December 2017 on extracting itself from involvement in Sawtooth, Twin Falls NSC (without fail) demanded payment of its Management Fee for that month.

### AmSurg's Refusal to Cooperate in the Transition of Sawtooth Operations

41.     At the time of Twin Falls NSC's withdrawal from membership in Sawtooth, Twin Falls NSC expressed it alleged good faith intention to effect a transition.  Beginning immediately with the new year (in early January 2018) Sawtooth attempted to engage with AmSurg's personnel to arrange an orderly and logical transition of information and operational responsibilities to Sawtooth.  Sawtooth was proactive in this efforts, drawing up detailed and logical agendas and requests for information to enable an orderly and competent transition.  In response, Todd Shepherd informed Center Administrator, Debbie Wensink, that AmSurg would not incur attorneys' fees to communicate with Sawtooth.

42.     Over the following two months, strenuous attempts were made by Sawtooth to obtain the information it required to knowledgeably conduct business in the wake of Twin Falls NSC's departure from membership.   On an almost weekly basis, Sawtooth would discover that AmSurg had taken unilateral action on behalf of Twin Falls NSC that directly injured Sawtooth and its ability to operate as a business; these actions were undertaken without prior consultation

**COMPLAINT FOR DAMAGES** – Page 16

with Sawtooth and demonstrated an intentional disregard for Sawtooth's interests.. This incompetence by AmSurg is manifested by substantiated facts that include (without limitation) the following:

a.      Sawtooth was forced to repeatedly 'hound' AmSurg to get records on accounts payable, accounts receivable, and other obligations that AmSurg had theretofore administered.  To the present, Sawtooth is still attempting to piece together the information that AmSurg has insufficiently provided.

b.      While Sawtooth was in the process of securing new malpractice insurance coverage, it was discovered that **Twin Falls NSC unilaterally cancelled the liability insurance policy for the Center without notice to Sawtooth or so much as an inquiry as to whether Sawtooth had procured replacement insurance as part of its transition plan.**

c.      Further, Twin Falls NSC unilaterally filed income tax returns for Sawtooth for Tax Year 2017 and marked those returns as "Final".  This has precipitated the potential for significant income tax consequences to Sawtooth and its Members in terms of how the distributions made in Tax Year 2017 were characterized and how the 'basis' of assets would be calculated given the fact that Sawtooth did not terminate its business actions.  Despite numerous requests by Sawtooth, Twin Falls NSC has yet to correct this misrepresentation to the Internal Revenue Service and/or the Idaho State Tax Commission.

d.      Throughout this period of attempted transitions, AmSurg made repeated demands for financial information along with a detailed synopsis of required information to assess relevant issues and obtain a complete profile of Sawtooth's business activities.   AmSurg

either failed to provide the documents or, in some instances, alleged that such information would constitute a burdensome exercise.

e.     On 19 March 2018, Sawtooth attempted to address a number of issues with Twin Falls NSC through their respective legal counsel.  Among these issues was a series of outstanding invoices that Sawtooth had expected were paid by Twin Falls NSC given that they were incurred during Twin Falls NSC's membership in Sawtooth and had become significantly delinquent prior to its withdrawal from Sawtooth.  In responding to this enquiry, Twin Falls NSC (through AmSurg and its counsel) claimed these were Sawtooth's obligations and that Twin Falls NSC's obligations to pay those past-due invoices ended with its membership interest in Sawtooth.

43.     On 23 March 2018, Sawtooth's counsel e-mailed a Notice of Dispute and Demand to Twin Falls NSC's counsel and AmSurg's in-house counsel for ambulatory services, whom (Sawtooth has recently learned during discovery in the Arbitration) was allegedly a 'Vice President' of Twin Falls NSC since 2012.   The Notice of Demand contained a pre-litigation document preservation 'freeze'.  Dispute resolution procedures dictated by the Sawtooth Operating Agreement followed, including informal discussion and pre-arbitration mediation.  All such efforts failed and exhibited an apparent lack of comprehension by Twin Falls NSC of the facts and issues relevant to the dispute raised by Sawtooth.

44.     These facts, as documented herein, constitute multiple incidents of breach of the fiduciary duties of loyalty, care, and against self-dealing prohibited by Idaho law and contrary to generally acceptable minimum standards appropriate to a Managing Member in the healthcare sector as they relate to the specific context of ambulatory surgery centers.

<u>Causes of Action Alleged Against Twin Falls NSC</u>

**COMPLAINT FOR DAMAGES** – Page 18

45.     Sawtooth has made claims in the Arbitration against Twin Falls NSC for Breach of Fiduciary Duty as follows:

a.      Under Idaho law, a managing member of a limited liability company has a duty to account to the company and hold as trustee for it any property, profit or benefit derived by the member or manager in the conduct or winding up of the company's activities, from a use by the member or manager of the company's property, or from the appropriation of an LLC's opportunity.  The Sawtooth Operating Agreement reaffirmed those duties and identifies no intent to exclude other obligations imposed by Idaho law that were not specifically identified.

b.      Under Idaho law, a member of a limited liability company also has a duty to refrain from dealing with the company in the conduct or winding up of the company's activities as or on behalf of a person having an interest adverse to the company.

c.      Twin Falls NSC violated these obligations by virtue of its acts and omissions in the discharge of its duties as Managing Member of Sawtooth.  These violations are manifested by substantiated facts that include (without limitation) the following:

i.      As stated in detail above, Twin Falls NSC failed to defend the interests of Sawtooth with respect to the treatment of the Ophthalmology Group, the resolution of legitimate disputes that constituted a premise to that group's ongoing involvement with Sawtooth, a failure to properly enforce the provisions of the Sawtooth Operating Agreement with respect to the redemption, surrender and/or transfer of membership units by the

COMPLAINT FOR DAMAGES – Page 19

Ophthalmology Group, and its failure to take action to remedy the abandonment of equity positions and enforcement of the noncompetition agreement. Alternatively, Twin Falls NSC failed to properly enforce the terms of the Sawtooth Operating Agreement and facilitated the Ophthalmology Group's departure from (and subsequent competition with) Sawtooth.

ii.   As stated above, Twin Falls NSC stood idly by while St. Luke's interfered with the membership of Sawtooth, the non-Member physicians who performed procedures at Sawtooth for the betterment of their patients, and for those who wished to continue working with Sawtooth but were under pain of retaliation by St. Luke's. These actions were openly known to Twin Falls NSC, were disclosed to Twin Falls NSC (through AmSurg) on a repeated basis throughout AmSurg's period of membership in Twin Falls NSC, and were internally discussed and acknowledged by Twin Falls NSC as a significant hindrance to Sawtooth's business. Yet nothing was done to remedy this interference.

iii.   Twin Falls NSC failed to (i) properly implement, administer, and enforce the adjustment of compensation/financial draws taken by Non-Managing Members who either 'retired' or no longer performed services at Sawtooth, and (ii) 'claw back' or take other action to recoup such financial benefits paid to the Non-Managing Members in question who no longer contributed to the preservation

or appreciation of the equity value and financial interests of Sawtooth.

d.      A Member has a duty to refrain from competing with the company in the conduct of the company's activities before the dissolution of the company. Twin Falls NSC enabled, assisted and/or failed to prevent other Members to compete with Sawtooth.  Twin Falls NSC further allowed the departure of the ophthalmology group with a buy-out at a nominal rate ($1.00/unit versus true value of approximately $4,500/unit).  AmSurg also refused to reduce management fee or income percentage at the demand of the ophthalmology group and corresponding facilitation of departure of those physicians and conditioned any concessions upon the reduction of rent charged to Sawtooth.  In so doing, Twin Falls NSC placed its own pecuniary interests (i.e., collecting its management fee) by ensuring that any food taken out its mouth in the form of a reduced management fee could be recouped through a reduction in operating costs (i.e., rent reductions) allowing Twin Falls NSC to maintain its financial benefit.

e.      The damages associated with and resulting from Twin Falls NSC's breach of its fiduciary obligations is manifest in (a) the loss of equity value in Sawtooth suffered over the period of Twin Falls NSC ownership under AmSurg's control; (b) lost revenue associated with the departure of physicians that could have been prevented through the correct advocacy of Sawtooth's interests commensurate with Twin Falls NSC's obligations as its Managing Member.

46.     Sawtooth has alleged claims against Twin Falls NSC for breach of contract with respect to the Sawtooth Operating Agreement as follows:

a.      As demonstrated by the facts alleged above, a valid and enforceable contract existed in the form of the Sawtooth Second Amended Operating Agreement.  Twin Falls NSC failed to provide competent management services to Sawtooth.  Any efforts that translated into an actual preservation of Sawtooth's business interests originated with, and were executed by, its non-Managing Members, albeit subject to Twin Falls NSC's right of approval.  Nevertheless, AmSurg withheld, and continued to withhold through December 2017, a monthly "Management Fee" equal to six-percent (6%) of Sawtooth's receipts.

b.      Between late 2011 and 2017, no substantive managerial action that meets the definitions set forth in Article XIV of the Sawtooth Operating Agreement were undertaken by Twin Falls NSC.  Sawtooth's non-Managing Members performed all material obligations under the Operating Agreement and substituted their own effort for the responsibilities of Twin Falls NSC.  Based upon a review of information available, the only discernable 'services' rendered by Twin Falls NSC related tenuously to the concept of 'management' consisted of bookkeeping and accountancy, the distribution of mass-produced management materials and a single strategic-planning session that involved an analysis and statement of needed action that was never executed.

c.      Twin Falls NSC incurred obligations (i) without notice, disclosure or any adherence to corporate governance requirements imposed by the Sawtooth Operating Agreement and/or the relevant provisions of the Idaho Revised Limited Liability Company Act, including without limitation, and (ii) that were left unpaid despite the obligation upon Twin Falls NSC to pay said obligations in its capacity as Managing Member.

d.      These breaches caused damage to Sawtooth and its (then) non-Managing Members as alleged above with respect to erosion of revenue, loss of opportunity and

payment of management fees in exchange for breaches of the Operating Agreement, and violations Twin Falls NSC's fiduciary obligations as Managing Member.

47.     Sawtooth has alleged claims against Twin Falls NSC for intentional interference with prospective economic advantage as follows:

        a.     Sawtooth had a valid economic expectancy because its Operating Agreement contains a strict non-competition clause and non-Member physicians had been conducting surgical procedures at Sawtooth by their own volition and with substantial benefit inuring to all Sawtooth-related parties.  Sawtooth's expectation of the continued income generated by the Ophthalmology Group, plastic surgeons, orthopedic surgeons, and anesthesia providers who performed procedures at Sawtooth.  Sawtooth also had the expectation that the Center would continue to benefit from the surgery income generated by the physicians without improper interference by outside interests, be it the self-interest of Twin Falls NSC (and AmSurg behind it) or St. Luke's.

        b.     Sawtooth's expectancy was valid on account of the fact that the physicians who subsequently departed wished to continue performing procedures at (and/or holding Membership in) Sawtooth.  Sawtooth's non-Managing Members were supportive of these income-generating activities and actively encouraged Twin Falls NSC to fulfill its obligations as Managing Members by acting in the best interests of Sawtooth in retaining the services and/or membership of these physicians and health care providers.

        c.     Twin Falls NSC was Managing Member of Sawtooth during the time in which (i) Sawtooth enjoyed the benefit of the income generated by the physicians identified herein; (ii) the interference that occurred to impair the benefit associated with that economic benefit: (iii) opportunities existed to correct the interference in question; (iv) the

Managing Member of Sawtooth was legally obligated to protect and advance the interests of the Center obligation; and (v) the physicians who had theretofore benefitted the Center withdrew their income-generating activities from Sawtooth. Thus, Twin Falls NSC (and AmSurg behind it) had both actual and constructive knowledge of this expectancy and an express (and implied) obligation to act for the purposes of avoiding interference with these benefits.

      d.    AmSurg intentionally and knowingly failed to take steps to retain the services of the physicians in question, to place the interests of Sawtooth above its own, and refused to take steps to (a) retain the services of the physicians who performed surgical procedures at the Center and/or held equity interests in Sawtooth; and (b) assert claims against the departing physicians and St. Luke's.

      e.    AmSurg also allowed ophthalmology and anesthesiology practice groups to sell their shares for a nominal sum ($1.00/share) instead of (a) adjusting their [AmSurg's] compensation or (b) following the Third Amended Sawtooth Operating Agreement provisions governing valuation, thereby enabling the physicians to compete with the Center.

      f.    AmSurg placed its own interest in drawing down management fees over the interests of retaining income generating activities in the Center, therefore the interference was wrongful by a measure beyond the fact of the interference itself.

      g.    The resulting loss of income generated by the physicians in question constitutes the principal injury to Sawtooth.

<u>Damages</u>

**COMPLAINT FOR DAMAGES** – Page 24

48.   To date, Sawtooth has suffered substantial economic injury, which includes, without limitation, the following:

a.   Loss of the value of equity in Sawtooth, from approximately $14.4 million Dollars at the time of AmSurg's acquisition of Twin Falls NSC to $430,000.00 at the time of Twin Falls NSC's withdrawal from membership in Sawtooth;

b.   Loss of future revenue anticipated to total approximately thirty-six million Dollars ($36,000,000.00) in gross receipts;

c.   Attorneys' fees, pre- and post-award interest, costs of arbitration, disbursements, and other ancillary relief incurred in connection with the Arbitration.

<u>Posture of Pending Arbitration</u>

49.   As stated above, arbitration proceedings before the American Arbitration Association are currently pending between Sawtooth and Twin Falls NSC.  In the event the pending Arbitration results in an award in favor of Sawtooth, confirmation and enforcement of said award by this Honorable Court will be required pursuant to the applicable requirements of Idaho law and the Federal Arbitration Act, at 9 U.S.C. § 1, *et seq.*

50.   Further, in light of the allegations made in the context of the pending arbitration and herein, declaratory and other relief relevant to a determination that Twin Falls NSC is the alter-ego of AmSurg will be sought.

51.   In the meantime, Sawtooth anticipates promptly moving to stay the present action pending the outcome of the Arbitration.

52.   Further, Sawtooth anticipates amending the present Complaint for the sake of conforming the facts relating to the parties' relationship, the claims asserted in the Arbitration, and any findings made in the Arbitration to the extent an Award is made in Sawtooth's favor.

**COMPLAINT FOR DAMAGES** – Page 25

### III.

### FIRST CAUSE OF ACTION

### DECLARATORY RELIEF AS TO MEMBER/ALTER-EGO LIABILITY

53.     Sawtooth re-alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein and further alleges as follows:

54.     To the extent that the pending Arbitration (*see supra*) results in an award in favor of Sawtooth, Sawtooth hereby re-alleges and incorporates by reference all claims asserted above and its entitlement to confirmation of the Arbitration Award pursuant to Sawtooth's right to amend the Complaint to confirm any Arbitration Award in favor of Sawtooth and to seek relief against AmSurg as sought herein.

55.     In 2011, NSC sold the majority of its portfolio of surgery centers to AmSurg Corporation.  This transaction included a majority membership interest in Sawtooth held in the name of Twin Falls NSC.  At the time AmSurg succeeded to ownership of Twin Falls NSC, Twin Falls NSC held 51% of the membership interest in Sawtooth.  Between 2011 and 2017, that membership interest increased to approximately 54% due to changes in the equity held by non-Managing Members of Sawtooth.  Twin Falls completely withdrew from membership of Sawtooth on or about 26 December 2017.

56.     A unity of interests and ownership between the Defendants in this matter exists to a degree that the separate personalities of Twin Falls and AmSurg does not exist and did not exist at any time relevant to the present matter.

57.     This unity of interests and ownership between Defendants is evident by the commingling of financial, decision-making/management, and operational activities as specified (without limitation) herein (*see infra*) and identified without prejudice to the underlying allegations

of Sawtooth: that the manner and sufficiency of these actions was inconsistent with the duties and obligations owed by the 'Managing Member' of Sawtooth.

58.     The financial activities of Twin Falls NSC were commingled with those of AmSurg.  Specific and substantiated facts attesting to this unity include, without limitation, the following:

>       a.      AmSurg controlled, directed and/or executed all decisions governing the development of Sawtooth's business, recruitment of physicians, the management of Sawtooth's financial relationship with other healthcare providers, and health insurance companies;

>       b.      AmSurg controlled the financial information management relating to Sawtooth's operations and directed the manner in which this information was to be supplied by Sawtooth;

>       c.      AmSurg administered Sawtooth's employee benefits plan (e.g., 401(k) plans, etc.) and caused Sawtooth employees to participate in an employee benefits plan under the name of "AmSurg" not Sawtooth or Twin Falls NSC;

>       d.      AmSurg controlled the accumulation of accounting data, performed accounting activities (e.g., bookkeeping, accounts payable ledgers and records, accounts receivable ledgers and records), and prepared interim and year-end financial statements (e.g., balance sheets, statements of earnings/income statements, and profit & loss statements) for Sawtooth; and

>       e.      AmSurg was responsible for preparing and filing all federal and state income tax returns for Sawtooth.  The signatory(ies) on such income tax returns

during the time period at issue were "AmSurg Corp.", "AmSurg Holdings", and even "Envision Healthcare", but not Twin Falls NSC.

59.     The decision-making processes of Twin Falls were commingled with those of AmSurg.  Specific and substantiated facts attesting to this unity include, without limitation, the following:

a.     Twin Falls NSC has testified that all directors and officers allegedly appointed to positions within Twin Falls NSC were concurrent with positions held within AmSurg.  However, no documentation has been identified to confirm that any directors and officers allegedly appointed to positions within Twin Falls NSC were in fact appointed;

b.     Twin Falls NSC did not have any employees individuals during the period of its membership in Sawtooth;

c.     Sawtooth was both required and instructed to seek approval for business-related decisions from representatives of AmSurg, who held themselves out as representatives of AmSurg and not Twin Falls NSC;

d.     All actions undertaken by Twin Falls NSC were carried out by representatives of AmSurg who held themselves out as representatives of AmSurg and not Twin Falls NSC;

e.     All corporate records relating to the management of Sawtooth (e.g. board meeting agendas, meeting minutes, etc.) referencing the attendance and/or participation of the 'Managing Member' by AmSurg representatives and actions to be taken with respect to and/or on behalf of AmSurg, not Twin Falls NSC;

f.   All corporate records relating to the management of Sawtooth were prepared, reviewed and/or approved by AmSurg personnel;

g.   All legal matters were subject to review and approval by the General Counsel for Ambulatory Services or other related 'in-house' counsel at AmSurg, not Twin Falls NSC;

h.   The perception of both Sawtooth's employees and non-Managing Members was that "AmSurg" was 'in charge' of Sawtooth and its majority member, not Twin Falls NSC;

i.   Twin Falls NSC's designated place of business was not Sawtooth's address in Twin Falls, Idaho, but instead was (and remains) identical to the corporate campus of AmSurg: 20 Burton Hills Boulevard in Nashville, Tennessee;

j.   "AmSurg Holdings, Inc." was listed as the "Member" of Twin Falls NSC in all annual reports filed with the Idaho Secretary of State between 10 October 2011 and 24 December 2017; and

k.   Notwithstanding the requirement that only one (1) governor of a limited liability company be disclosed on an annual report (per Idaho Code § 30-21-213), the only individual ever identified on those annual reports as associated with Twin Falls NSC was a Ms. Claire Gulmi, who held the position of Chief Financial Officer for AmSurg.

60.   The management actions of Twin Falls NSC--with respect to Sawtooth--were commingled with those of AmSurg to a degree that separate personalities of Twin Falls and AmSurg did not exist.  Specific and substantiated facts attesting to this unity include, without limitation, the following:

a.     All communications between Twin Falls NSC and both (a) the personnel working for Sawtooth and (b) the non-Managing Members of Sawtooth were conducted in relation to all being part of an AmSurg enterprise, not an enterprise of Twin Falls NSC.  References were made in relation to "AmSurg" not Twin Falls NSC;

b.     All internal communications between parties representing the 'Managing Member' of Sawtooth (to the extent disclosed to Sawtooth in the form of approximately 7,700 pages of document production in the Respondent) were exchanged between representatives of AmSurg and with reference to "AmSurg" and not Twin Falls NSC;

c.     The form of all policies and procedures relating to employment, management and operations were issued by and bore the name and markings of AmSurg, not Twin Falls NSC;

d.     The substantive implementation of all policies and procedures relating to Sawtooth employees was conducted by AmSurg, not Twin Falls NSC. Communications regarding policy and procedure addressed Sawtooth employees as employees of "AmSurg", not of Sawtooth or Twin Falls NSC.  AmSurg administered and paid payroll for all Sawtooth employees.  These payroll practices were directed by AmSurg, pursuant to AmSurg instructions, and "AmSurg" was the party identified on the direct deposit records of paychecks for Sawtooth employees;

e.     The substantive implementation of all policies and procedures relating to the management of Sawtooth was conducted by, and at the direction of, AmSurg,

**COMPLAINT FOR DAMAGES** – Page 30

not Twin Falls NSC. AmSurg conducted all training seminars under the name "AmSurg", not of Sawtooth or Twin Falls NSC. All communication between the administrative personnel and non-Managing Members of Sawtooth on one hand, and with the Managing Member of Sawtooth on the under, was held with representatives of AmSurg who held themselves out as affiliated with "AmSurg," At no time did any party acting for, or on behalf of, the Managing Member of Sawtooth identified an affiliation with Twin Falls NSC; all affiliations were communicated and held-out as affiliations "AmSurg", not with Twin Falls NSC;

f.      On the (very few) occasions when 'strategic planning' of Sawtooth's business was conducted by the 'Managing Member' of Sawtooth, the materials prepared for these activities bore the name "AmSurg", not "Twin Falls NSC". The representatives of the 'Managing Member' of Sawtooth attending meetings relevant to these activities were AmSurg representatives; and

g.      The perception of all Sawtooth employees and all non-Managing Members was that "AmSurg" was 'in charge' of Sawtooth and its majority member, not Twin Falls NSC.

61.     Twin Falls NSC has alleged that a properly constituted Board of Directors was constituted during the time it was the Managing Member of Sawtooth and specifically between 20 October 2011 and 26 December 2017. However, no documents confirming this have been produced in the Arbitration despite requests from Sawtooth.

62.     Twin Falls NSC has alleged that it followed corporate governance procedures in terms of internal corporate governance during the time it was the Managing Member of Sawtooth and specifically between 20 October 2011 and 26 December 2017. However, Twin Falls NSC has

failed to produce a single corporate resolution, board meeting agenda, board meeting minute report, or other indicia that would confirm that (a) such governance activities occurred, or (b) such governance activities occurred for the purposes of distinguishing the actions of Twin Falls NSC from those of AmSurg.  The only document known to exist that indicates any form corporate governance is a generic two-page 'Operating Agreement' executed by Twin Falls NSC in 2006, prior to its acquisition of Sawtooth and five (5) years before AmSurg acquired Twin Falls NSC.

63.  Twin Falls NSC has also alleged that it was entitled under the Sawtooth Operating Agreement to delegate and/or assign responsibilities--relevant to the performance of its duties as Managing Member of Sawtooth---to third-parties.  However, no documents or agreements have been produced to support any such delegation(s) and/or assignment(s).  Moreover, the corporate representative of Twin Falls NSC produced for deposition in the Arbitration (and held out as the person having sufficient knowledge of the topics propounded by Sawtooth, which included, *inter alia*, the corporate governance of Twin Falls NSC and relationships between it and other parties such as AmSurg) could not provide coherent testimony or any details as to any such delegation(s) and/or assignment(s).

64.  Based upon the discovery exchanged in the Arbitration, Twin Falls NSC was undercapitalized/not sufficiently capitalized.  Specific and substantiated facts attesting to this unity include, without limitation, the following:

a.  Twin Falls NSC was financed solely through the revenue generated by Sawtooth;

b.  Twin Falls NSC's sole business activity and asset holding was a membership interest in Sawtooth;

**COMPLAINT FOR DAMAGES – Page 32**

       c.     Twin Falls existed for no reason other than as a product of its acquisition of NSC's portfolio of ambulatory surgery centers in 2011.

65.    If the foregoing acts and omissions are treated as acts and omissions of the Twin Falls NSC and not AmSurg, a grossly inequitable result would follow.   Twin Falls NSC is undercapitalized, and not finding it the alter ego of AmSurg would result in Plaintiff's inability to recover all damages.

66.    A judicial declaration is necessary to ascertain the rights and remedies of the parties in relation to the issues surrounding AmSurg's mismanagement of Sawtooth.

## IV.

## PRAYER FOR RELIEF

WHEREFORE, Sawtooth prays for relief as follows:

1.    That the Court enter a judgment in favor of Sawtooth against Defendants, and each of them, awarding damages in an amount in excess of $75,000.00;

2.    For confirmation of the Arbitration Award to the extent it is awarded in favor of Sawtooth.

3.    For the issuance of a judicial declaration as prayed for herein;

4.    For an award of Sawtooth's costs and disbursements incurred in connection with this matter; and

5.    For such other and further relief as the Court deems just, proper, and equitable.

DATED:        19 August 2018                Respectfully Submitted,

                                            ANGELO L. ROSA, ESQ.

                                            _____
                                            Angelo L. Rosa
                                            Attorney for Plaintiff
                                            SOUTHERN IDAHO AMBULATORY
                                            SURGERY CENTER, LLC